IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | | |
|---|---|---|
| CIMENGA M. TSHIBAKA, M.D.<br>2021 New Cut Road<br>Westminster, MD 21157 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: |
| | * | |
| BOARD OF DIRECTORS OF<br>CARROLL HOSPITAL CENTER, INC.,<br>Charles O. Fisher, Resident Agent<br>179 East Main Street<br>Westminster, MD 21157, | *<br><br>* | |
| | * | |
| JOHN SERNULKA, Individually and in<br>His Official Capacity as CEO of<br>Carroll Hospital Center, Inc.<br>Carroll Hospital Center<br>200 Memorial Avenue<br>Westminster, MD 21157, | *<br><br>*<br><br>* | |
| | * | |
| and | * | |
| | * | |
| JAIME ELLIOTT, Individually,<br>Carroll Hospital Center<br>Wound Care Center<br>200 Memorial Avenue<br>Westminster, MD 21157 | *<br><br>* | |
| | * | |
| Defendants. | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Cimenga M. Tshibaka, M.D., by and through his attorneys, Conrad W. Varner and Varner & Goundry, A Professional Corporation, files this Complaint against the Defendants and alleges as follows:

## JURISDICTION

1.  Plaintiff is an adult African-American citizen of the United States and a resident of the State of Maryland.  He was born in the Democratic Republic of the Congo.

2.  Defendant, Carroll Hospital Center (hereinafter Hospital) is a private, not for profit corporation, that operates a hospital in Carroll County, Westminster, Maryland and provides outreach and cooperative programs in Baltimore County, Frederick County, and Baltimore City.

3.  The governing body of the Hospital consists of a Board of Directors (Board) which has the ultimate authority to act on recommendations for the restriction or termination of physician hospital privileges.  At all times material to this action, all of the Directors were Caucasian.

4. Defendant, John Sernulka, a Caucasian adult citizen of the United States and the State of Maryland, at all times material to this action was the Chief Operating Officer of the Hospital.  He resides in Howard County, Maryland and maintains his place of business in Carroll County, Maryland.

5. Defendant, Jaime Elliott, at all times material to this action was a patient care technician in the Wound Care Center at the Hospital. She resides and works in Westminster, Maryland. She is a Caucasian adult citizen of the United States and the State of Maryland.

2

6.  Jurisdiction in this court is based on the residency of the parties in Maryland and venue is proper in Baltimore City where the Defendant Hospital carries on a place of business.

7. Jurisdiction in this court is based also on the Maryland Declaration of Rights and  42 U.S.C.A. §§ 1981.

<u>FACTUAL ALLEGATIONS</u>

8.  Plaintiff is certified by the American Board of Surgery as a specialist in general surgery.  At all times material to this action Plaintiff was licensed to practice medicine in the State of Maryland.  Until the revocation of his privileges by the Defendant Board, he practiced as a specialist in general, cardiovascular and thoracic surgery in Westminster, Maryland.  He currently has privileges at Northwestern Hospital and Howard General Hospital.  He graduated from the University of Maryland Medical School in 1997, completed his general surgery residency at Seton Hall University in 2003 and his fellowship training in cardiovascular and thoracic surgery at the University of Illinois at Chicago in 2005.

9. The Defendant, Board of Directors of the Carroll Hospital Center, Inc., is the governing body of the Hospital which has approximately 220 beds.  The Hospital is a community hospital whose principal place of business is Westminster, Maryland.  In addition, it provides outpatient or cooperative services in Baltimore City, Baltimore County, Howard County and Frederick County.  At all times material to this complaint, the medical staff consisted of approximately 400 physicians, all of whom were Caucasian with the exception of two physicians,

3

including the Plaintiff. With the denial of Plaintiff's privileges, only one African-American remains on staff.

10.   On or about August 1, 2005, Plaintiff applied for privileges at the Hospital. A thorough background investigation was done by the Hospital before Plaintiff was granted privileges on April 11, 2006 to practice general and cardiovascular and thoracic surgery. Plaintiff's privileges were renewed at the Hospital at two year intervals thereafter including the year 2013.

11.   The duties and responsibilities of staff physicians at the Hospital are governed by Medical Staff Bylaws (hereinafter Bylaws). These Bylaws constitute a contract between each member of the medical staff, including Dr. Tshibaka, and the Hospital. At all times material to this action, Plaintiff was entitled to all the rights and privileges granted by the Bylaws.

12.   The Bylaws contain specific provisions for violations of the Hospital's sexual harassment policy. Those provisions authorize the CEO to order a summary suspension of the privileges of a staff member who violates the policy "when the conduct or condition of the Member presents an immediate threat of danger to any patient, other practitioner, Hospital personnel or visitor...", Provided, however, that the CEO's order is reviewed by the Executive Committee of the Medical Staff (MEC). If the MEC affirms the decision of the CEO, the staff member is entitled to a fair hearing before a panel chosen by the President of the Medical Staff.

13. On June 27, 2013, Plaintiff was an active member of the medical staff without any restrictions on his privileges and without any pending or past disciplinary actions.

14.     On March 15, 2010, Plaintiff entered into an Early Resolution Agreement (Agreement) with the Defendant CEO.  In the Agreement, Plaintiff acknowledged that a complaint had been filed against him by a Caucasian female nurse alleging sexual harassment.  In the Agreement Plaintiff specifically denied the allegations. Under the terms of the Agreement Plaintiff agreed to submit to a mental health evaluation by a professional chosen by the Hospital and if found by the professional to be willing and able to comply with the Hospital rules, his privileges would continue without restriction. He also agreed to submit to counseling with a mental health professional.  He agreed to authorize the professional to report his/her findings.  Finally, he agreed (Agreement, Paragraph F) that if another complaint was filed against him that was deemed credible by the CEO, summary suspension procedures would be instituted against him.

15. In accordance with the Agreement, Plaintiff submitted to the mental health evaluation by Chris Kraft, Ph.D. and Kate Thomas, Ph.D., members of the Center for Sexual Health.  On August 3, 2010, Kate Thomas reported to Tracey Ellison, Vice-President of Human Resources for the Hospital, inter alia, that: (1) the accounts of the complaining and other witnesses were not sufficiently reliable to determine what transpired or what the nature of the problem was; (2) that she could confidently say that the Plaintiff did not have a "specific sexual disorder

diagnosis"; (3) that he is a safe practitioner and does not pose any danger to the staff; and (4) that his interpersonal skills are "at times lacking..." and therefore he could benefit from six months of counseling.

16. Plaintiff completed the recommended six months of counseling and on March 28, 2011, Kate Thomas reported to Tracey Ellison that the Plaintiff had satisfactorily completed the counseling, that the goals of therapy had been met, and that he was being discharged from their care.

17. On May 18, 2011, Plaintiff, by counsel, based on the reports by Kate Thomas, requested the Hospital modify paragraph G of the agreement in which the parties agreed that the Hospital on inquiry from credentialing bodies would submit the Agreement and report only that a complaint had been filed, an investigation was conducted, and that no restrictions had been placed on Plaintiff's privileges. Defendant Sernulka refused.

18. Following the submission of the reports by Kate Thomas, Plaintiff submitted applications for employment and privileges at other institutions. His applications were denied. On information and belief, Defendant Sernulka submitted the Agreement to these employers and institutions without disclosing the Kraft and Thomas reports. As a result, Plaintiff's applications for employment were denied.

19. On June 24, 2013, Defendant, Jaime Elliot, a wound technician at the Wound Clinic of the Hospital, uttered to other members of the staff, false and

defamatory racially motivated accusations that she had been sexually assaulted by the Plaintiff.

20. At the instigation of fellow staff members, Defendant Elliot wrote a false and defamatory report of the incidents upon which her false and defamatory statements were based. She then submitted this report to Joyce Romans, Vice-President of Risk Management. There were no witnesses who could verify Defendant Elliot's factual allegations.

21. On June 25, 2013 Defendant Sernulka notified Plaintiff in person and later by letter dated June 27, 2013 that he was summarily suspended based on the complaint of Defendant Elliott and his determination that her complaint was credible. In his face to face meeting with Plaintiff, Defendant Sernulka notified Plaintiff that he had locked him out of the hospital and cancelled his scheduled operations. He also threatened him by promising to ruin his career. Further, he refused to hear Plaintiff's side of the story because he stated it might cloud his decision. He stated that he determined the credibility of the complaining witness based upon the reports she made to others and not by a face to face determination of her credibility. He further refused to allow Plaintiff to attend the MRC meeting on the 27th stating that the MEC will make its decision without the benefit of Plaintiff's appearance. Finally, he stated that his decision was based on the Early Resolution Agreement.

22. Defendant Sernulka failed, refused, and ignored the reports of Drs. Kraft and Thomas and failed and refused to submit these reports to the MEC. His

determination that Plaintiff presented an immediate danger to the staff was based on the uncorroborated statement of Defendant Elliott. At the time he summarily suspended the Plaintiff, Defendant Sernulka had no reasonable basis to believe that there was a substantial likelihood of immediate injury to the health or safety of a patient, employee or other staff member, or that a patient, employee or staff member's life needed protection, or any other reason to justify the suspension. Moreover, he failed to take reasonable steps to investigate the allegations before he suspended the Plaintiff.

23. On information and belief, Defendant Sernulka published his decision and the allegations of Defendant Elliott to others in bad faith with the sole intent to personally ruin Plaintiff's career by terminating his privileges at the Hospital. His publishing of his decision orally and in writing constitutes slander and libel per se.

24. Defendant believes and therefore avers that Defendant Sernulka's actions were made in bad faith, were motivated by Plaintiff's race and national origin. Moreover, his threats to ruin Plaintiff's career, his superficial and biased investigation, his deliberate failure to disclose and to ignore the reports of Drs. Kraft and Thomas, his failure to submit these reports to the MEC, and his preclusion of Plaintiff from presenting a defense both to him and the MEC were motivated by his prejudice against African-Americans and specifically, Afro-American male relations with Caucasian females. Therefore, Defendant Elliott's complaints were merely a pretext for his racially motivated personal bias against Plaintiff.

25.  Under the Bylaws, Defendant Sernulka's suspension must be reviewed by the Medical Executive Committee (MEC) of the Medical Staff.  The MEC met on June 27, 2013 to review Defendant Sernulka's decision and the basis for his decision.  In the meeting, Defendant Sernulka deliberately withheld the reports of Drs. Kraft and Thomas and presented only the statements of the complaining witness and the Early Resolution agreement.  In addition, Plaintiff was not permitted to attend to defend himself, nor was his employer, who was a member of the MEC, permitted to attend to speak on his behalf.

26.  On June 28, 2013, the MEC voted to continue Plaintiff's summary suspension.  Defendant Sernulka delivered the decision of the MEC to continue the suspension and notice of Plaintiff's right to appeal the MEC decision to the Defendant Board of Directors, to the Plaintiff in his private office.  At the time he did so, Defendant Sernulka was wearing a concealed weapon, which he displayed to the Plaintiff with the intent to intimidate him and put him in fear.

27.  Under the Bylaws, Plaintiff was entitled to notice and an opportunity to be heard on the action taken by the Medical Staff Executive Committee and the Boards of Directors of the Hospital.  Under the Bylaws, the notice was required to state the reasons for the proposed action and identify the documents that supported the action.

28.  The notice Plaintiff received on June 27, 2013 from Defendant Sernulka indicating his decision to summarily suspend his privileges was insufficient to notify him of the charges against him.  Although the notice contained the complaint

of Defendant Elliott, it failed to state any basis for Defendant Sernulka's credibility determination. In addition, it stated that the Defendant Sernulka based his decision on the Early Resolution Agreement but it failed to mention the Kraft and Thomas reports.

29. Plaintiff made a timely request for a hearing. Pursuant to the ByLaws, the Chair of the Medical Staff appointed a hearing panel of three physicians that consisted, *inter alia*, of at least one hospital employee. All were Caucasian.

30. The hearing panel convened on July 9, 2013. Present at the hearing in addition to Defendant Sernulka, the Hospital's counsel and the hearing panel, was the attorney for the MEC.

31. Under the Medical Staff ByLaw, the presiding officer of the hearing is the Chair of the panel. The Medical Staff attorney (MS attorney), therefore, is merely an advisor. Nevertheless, the Medical Staff attorney presided over the hearing and issued rulings contrary to the Bylaws and contrary to the basic notions of procedural fairness. These rulings had a profound effect on Dr. Tshibaka's right to a fair hearing.

32. The MS attorney ruled that the Bylaws required a bifurcated hearing in which only the specific facts of the incident in question could be presented in the first stage of the hearing and that a second hearing concerning discipline would be required. This ruling prevented the Plaintiff from presenting facts and argument on the CEO's conduct and the failure of procedural fairness.

33. Also, the MS attorney admitted into evidence only paragraph F (permitting summary suspension of Plaintiff if another incident occurred in the future) of the Early Resolution Agreement after previously ruling that it was not relevant on the issue of prior adjudicated incidents as required by the Bylaws. The Kraft reports and the Plaintiff's denials of the accusations were not admitted.

34. Specifically, the MS attorney refused to permit Dr. Tshibaka's counsel from presenting facts showing bad faith on the part of the CEO, including the following;

    a. His failure to adequately investigate the allegations. The CEO accepted the second and third hand statements of staff members who were not witnesses to the event who purported to attest to the credibility of the Defendant Elliott.

    b. His intimidation of Dr. Tshibaka including threats to ruin him and report him to the NPDB and the Maryland Board of Physicians (MBOP).

    c. His service of a notice concerning the proceedings on Dr. Tshibaka in Dr. Tshibaka's office while carrying a concealed weapon, which he displayed to the physician.

    d. His Reliance on the Early Resolution Agreement while intentionally ignoring the evaluation by Dr. Kraft pursuant to that agreement and his failure to present the Kraft reports to the MEC.

    e. His failure to consider the racial implications of the incident.

f. His summary termination of Dr. Tshibaka's practice at the hospital by cancelling his cases and his openly publishing to others that Dr. Tshibaka was summarily suspended for sexually harassing Defendant Elliott.

g. His wrongful exclusion of Dr. Ali, Plaintiff's employer, from the MEC meeting.

h. His refusal to allow Dr. Tshibaka to attend the MEC to defend himself

35. On July 17, 2013 the hearing panel issued it decision. Of the two incidents reported by Defendant Elliott, the panel found her credible on the first but not the second. This decision was irrational, arbitrary and capricious, and racially motivated. The panel recommended that the Plaintiff be evaluated by a mental health professional and if determined safe, he could return to practice with full privileges.

36. Pursuant to the Bylaws, Plaintiff timely noted an appeal of the decision of the hearing panel on July 17, 2013. Pursuant to the Bylaws, a hearing was held before the Board of Directors. A Quorum of the Board was present, all of who were Caucasian and only one of whom was a physician. The physician member of the Board was ex officio and could not vote. The matter was heard on the record.

37. On July 26, 2013 the Board of Directors issued its decision rejecting the hearing panel on the second incident finding the Defendant's testimony credible as to both incidents and the testimony of the Plaintiff not credible. Based on this finding the Board terminated the Plaintiff's privileges. In so finding, and in substituting the credibility findings of the panel with its own, the Board violated

12

the Plaintiff's right to a fair hearing, was arbitrary and capricious, biased and prejudice, and in bad faith intentionally sought to ruin Plaintiff's career. The complaint of Defendant Elliott was a mere pretext for the Board's racially motivated bias toward the Plaintiff.

38. Defendant Board of Directors reported Plaintiff's suspension and ultimate revocation of his privileges to the National Practitioner's Data Bank, the Maryland Board of Physicians, and other credentialing health care organizations, including insurance companies and other hospitals where Plaintiff maintains privileges. The action of Defendant Board in revoking Plaintiff's privileges and in reporting the revocation of Plaintiff's privileges has, and will continue to have, a substantial impact on Plaintiff's ability to practice medicine and his ability to earn income from the practice of medicine.

39. The action of the Defendant Board in summarily suspending and later revoking Plaintiff's hospital privileges violated the Health Care Quality Improvement Act in the following specific respects:

a. The action was not taken in the reasonable belief that the action was in the furtherance of quality health care;

b. The action was not taken after a reasonable effort to obtain the facts of the matter;

c. The action was not taken after affording the Plaintiff with adequate notice and a fair hearing;

d. The Board's decision was not based on the reasonable belief that the Plaintiff's conduct was an imminent danger to the health and safety of any individual;

e. The Defendant Board's action was not required to prevent the imminent danger to the health and safety of any individual.

f. The actions of the Defendant Sernulka and the Defendant Board were made in bad faith, racially motivated, with malice and with specific intent to destroy Plaintiff's career.

Accordingly, Defendants are not entitled to immunity under the Health Care Quality Improvement Act of 1986, 42 U.S.C.A. 11112 or Health Occ. § 14-502 and Cts. & Jud. Proc. § 5-638.

## CLAIMS

### Breach of Contract (Common Law)

40.  Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

41.  The Medical Staff Bylaws (Bylaws) of Carroll Hospital Center, Inc., as well as the rules and regulations of the Hospital constitute a contract between the Plaintiff and the Defendants entitling the Plaintiff to all the rights and privileges contained in the Bylaws and rules and regulations of the Hospital.

42.  Defendant Board and its agents, including Defendant Sernulka, breached their contract with the Plaintiff by summarily suspending his privileges without

14

proper grounds for doing so and without a proper investigation of the charges against him in violation of Bylaws.

43. Defendant Board and Defendant Sernulka breached their contract with Plaintiff by suspending his privileges without affording him a fair review of the decision of Defendant Sernulka and by failing to permit him to appear before the MEC to defend himself in violation of the Bylaws.

44. Defendant Board and Defendant Sernulka further breached their contract with Plaintiff by failing to give Plaintiff proper notice and a fair hearing on the basis for his summary suspension and revocation in violation of the Bylaws.

45. Defendants Board and Sernulka further breached their contract with Plaintiff by failing to provide him a fair hearing on his appeal to the Board from the decision of the hearing panel.

46. The aforementioned breaches of contract have caused and will continue to cause financial losses to the Plaintiff including, but not limited, past and future lost income, loss of earning capacity, and loss of employability.

WHEREFORE, Plaintiff claims the sum of Ten Million Dollars ($10,000,000) in compensatory and consequential damages.

### Defamation - Defendant Elliott

47. Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

48. Defendant Elliott accusations of sexual assault against Plaintiff were false and defamatory made orally and in writing members of the wound care staff and in writing on June 24, 2013 were false and defamatory.

49. Defendant Elliott's false and defamatory statements were made maliciously, intentionally and were racially motivated.

50. Defendant Elliott's false and defamatory statements constitute libel and slander per se.

WHEREFORE, Plaintiff claims compensatory damages in the amount of Ten Million Dollars ($10,000,000) and punitive damages in the amount of Ten Million Dollars ($10,000,000).

## Defamation - Defendant Sernulka

51. Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

52. Defendant Sernulka published Defendant Elliott's false and defamatory statement to members of the medical and administrative staff and to the public knowing the statements to be false and defamatory or with reckless disregard for their truth or falsity for the sole purpose of ruining Plaintiff's medical career.

53. Defendant Sernulka's false and defamatory statements were made maliciously, intentionally and were racially motivated.

54. Defendant Sernulka's false and defamatory statements constitute libel and slander per se.

16

WHEREFORE, Plaintiff claims compensatory damages in the amount of Ten Million Dollars ($10,000,000) and punitive damages in the amount of Ten Million Dollars ($10,000,000).

### Defamation - NPDB, et al

55.  Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

56. Defendants Board and Sernulka, by and through their agents or employees issued a false and defamatory report to National Practitioners Data Bank ("NPDB"), the Maryland Board of Physicians (MBOP), other hospitals at which the Plaintiff maintains privileges and credentialing bodies of third party payers.  These reports were false and defamatory, made in bad faith, and racially motivated with the intention of ruining Plaintiff's career as a physician or made with reckless disregard for the truth or falsity of the reports.  These reports have subjected and will continue to subject Plaintiff to public ridicule and embarrassment, and will directly impair his ability to obtain gainful employment. The NPDB published this report on the World Wide Web and to Health Care Providers who have access to the NPDB nationally.

57.  As a direct result of the defamatory statements made in this report the Plaintiff has suffered, and will continue to suffer, financial harm and impairment of his earning capacity and his reputation.

17

WHEREFORE, Plaintiff claims the sum of ten million dollars ($10,000,000) in compensatory damages and ten million dollars ($10,000,000) in punitive damages, plus attorney's fees and costs.

## Tortious Interference with Prospective Advantage

58.  Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

59.  Prior to the wrongful termination of his clinical privileges, Dr. Tshibaka provided surgerical services to patients at the Hospital for over seven years.  Dr. Tshibaka intended to continue providing surgerical services to patients at the Hospital for the indefinite future.

60.  The conduct of Defendant Board and Sernulka in revoking Dr. Tshibaka's surgical privileges was intentional, willful, and calculated to cause damage to his lawful business of providing surgical services to patients at the Hospital.  The conduct of Defendants Board and Sernulka was perpetrated with the intentional and improper purpose of causing damage to Plaintiff's profession and business and was without justifiable cause.

61.  As a result of Defendant Board's and Sernulka's conduct and actions, Dr. Tshibaka has suffered and will continue to suffer substantial loss of income and irreparable harm to his professional reputation.

WHEREFORE, Plaintiff claims the sum of ten million dollars ($10,000,000) in compensatory damages and ten million dollars ($10,000,000) in punitive damages, plus attorney's fees and costs.

### False light Invasion of Privacy

62.  Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

63.  Defendants Board and Sernulka caused Plaintiff to suffer publicity which unreasonably placed Plaintiff in a false light before the public when they, through their agents, published information which they knew to be false and untrue.  The false and defamatory reports were made to the NPDB and other credentialing bodies.  Defendants' actions caused Plaintiff to report to potential employers, hospitals and licensing boards, that he had been summarily suspended and his privileges revoked.

WHEREFORE, Plaintiff claims the sum of ten million ($10,000,000) in compensatory damages and ten million dollars ($10,000,000) in punitive damages, plus attorney's fees and costs.

### RACE AND NATIONAL ORIGIN DISCRIMINATION UNDER 42 USC SECTION 1981

64. Plaintiff adopts and incorporates by reference herein each and every paragraph of the factual statement paragraphs 1-39.

65. Defendants, individually and in their official capacities, acting individually and/or in concert, intentionally sought to revoke and did revoke Plaintiff's hospital privileges on the grounds of his race.

66. Defendants pretext for terminating Plaintiff's privileges was based on Defendant Elliott's allegations of sexual assault, which allegations were false and known to be false, or with due diligence should have been found to be false.

19

67.  Defendants failure to provide a fair and impartial investigation and hearing process for Plaintiff was in furtherance of their design to revoke Plaintiff's privileges on the grounds of race.

68. Revocation of the Plaintiff's privileges by the Defendants Board and Hospital will have a disparate impact on the racial composition of the Hospital Medical Staff.

69. As a result of Defendant's intentional discriminatory conduct, Plaintiff has and will continue to suffer loss of income and earning capacity, reputation, and emotional damages.

WHEREFORE, Plaintiff claims the sum of ten million dollars ($10,000,000) in compensatory damages and ten million dollars ($10,000,000) in punitive damages plus attorney's fees and costs.

Respectfully Submitted,

Conrad W. Varner
VARNER & GOUNDRY
A Professional Corporation
121 East Patrick Street
Frederick, Maryland 21701
(301) 631-1800
Attorneys for Plaintiff,
Cimenga M. Tshibaka, M.D.

## REQUEST FOR JURY TRIAL

Plaintiff, Cimenga Tshibaka, M.D. demands a jury trial on all claims contained in this Complaint.

Conrad W. Varner